IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOSHUA MCMILLAN,<br>　　　　　Plaintiff, | :<br>:<br>: |
| v. | :     Civil No. 5:23-cv-04078-JMG |
| WARDEN CHERYL STEBERGER, *et al.*,<br>　　　　　Defendants. | :<br>:<br>: |

**MEMORANDUM OPINION**

**GALLAGHER, J.**　　　　　　　　　　　　　　　　　　　　　　　　　　　　　**July 10, 2025**

**I.　INTRODUCTION**

Mere medical malpractice or negligence in prison does not give rise to a constitutional violation. Plaintiff Joshua McMillan—who is a paraplegic—was arrested and imprisoned at Lancaster County Prison in October 2021. During that time, the prison medical staff treated him for a gluteal pressure wound on his right buttock. But nine days after his arrival, the wound showed serious signs of infection and he left the prison in an ambulance. He then sued Warden Cheryl Steberger and the prison medical staff, including their employer PrimeCare, alleging that his constitutional right to medical care under the Eighth Amendment was violated. Both the Warden and the medical providers moved for summary judgment. Because all but one of Plaintiff's constitutional claims amount to medical negligence at best, the Warden's motion is granted and the providers' motion is granted in part and denied in part.

**II.　BACKGROUND**

　　**a. Plaintiff Enters Lancaster County Prison on October 21, 2021, and Leaves Nine Days Later in an Ambulance.**

The events giving rise to this case began on October 21, 2021—the day Plaintiff arrived at Lancaster County Prison—and ended just nine days later on October 30, 2021—when an

1

ambulance took Plaintiff to Lancaster General Hospital because of an infected pressure wound. *See* ECF No. 33 at ¶ 7; ECF No. 37 at ¶¶ 53-55.

Before discussing what happened on those days, we must go back to 2018. On January 22 of that year, someone robbed Plaintiff's home and shot him several times. *See* ECF No. 33 at ¶ 10. This attack left Plaintiff with lower extremity paralysis, requiring him to permanently use a wheelchair. *Id*. Plaintiff suffered from chronic pressure sores because of his paralysis and long-term wheelchair use. *Id*. at ¶ 11. He also had a host of other serious medical problems stemming from the gunshot injuries: associated neurogenic bladder requiring periodic self-catheterization, neuropathic pain of legs, recurrent urinary tract infections, resistance to carbapenem antibiotics, reflex sympathetic dystrophy, anxiety, history of a pulmonary embolus, and chronic constipation due to chronic narcotic use." ECF No. 37 at ¶ 1.

After establishing that background, we jump in time now to the ten days in October 2021 when Plaintiff was incarcerated at Lancaster County Prison. Each day has its own turn of events. So, for the sake of clarity, the days will be covered separately, starting with the first one.

**Day One.** On October 21, 2021, Pennsylvania State Police arrested Plaintiff. ECF No. 33 at ¶ 15. After his arrest, Plaintiff needed to relieve his neurogenic bladder he and was also dealing with a chronic pressure wound on his right buttock. ECF No. 37 at ¶¶ 5-6. Before taking him to prison, the police brought him to Lancaster General Hospital's Emergency Department for medical clearance. *Id*. The medical staff at the hospital concluded that Plaintiff was not in acute distress and that the wound had no evidence of infection. *Id*. ¶ at 7. So they cleared him for incarceration with an order that he needed follow up care for his wound and needed to continue intermittent straight catheterization. *Id*. ¶ at 9.

Later in the evening, Plaintiff arrived at Lancaster County Prison. During his intake interview with prison staff, he noted that he had pain in his feet, buttocks, and stomach, that he

2

was taking "nerve pain meds," and that he was worried about his medical condition. *Id*. ¶ at 17. Prison staff also noted that he had pressure wounds and that he required prescription medication. *Id*. at ¶¶ 15-16. Plaintiff's wheelchair was placed in the inmate property box room. *Id*. at ¶ 20.

**Day Two.** On October 22, 2021, Plaintiff's first full day of incarceration, he started receiving care from the prison medical staff. Plaintiff alleges that Nurse Practitioner (NP) Lori Hehnly noted that he was "wheelchair bound" and "unable to obtain weight" but then documented his vital signs in a standing position. *Id*. at ¶ 21. Plaintiff also says that NP Hehnly recorded measurements for his wound even though she acknowledged that she was unable to see the wound because of his position. *Id*. at ¶ 22. He also received care from Nurse Klaudia Alasar, who completed a Wound Care Flow Sheet, noted no signs of infection, cleaned the wound, and covered it with new dressing. *Id*. at ¶ 23.

There is some dispute about the nature and extent of the care provided that day. The prison medical staff admit that NP Hehnly evaluated Plaintiff and documented the characteristics of his wound but otherwise deny Plaintiff's allegations about NP Hehnly. ECF No. 40 at ¶¶ 21-22. There is no dispute regarding Nurse Alasar's treatment. *Id*. at ¶ 23.

**Day Three.** On October 23, 2021, the record is light. The medical staff did not prepare a Wound Care Flow Sheet that day or record the measurements of Plaintiff's wound. ECF No. 37 at ¶ 24. Nurse Alasar, however, did explain in her medical notes for the day that she cleaned Plaintiff's wound and replaced the dressing. *Id*. at ¶ 25.

**Day Four.** The record is heavier for October 24, 2021. Registered Nurse (RN) Brian Rotheram prepared a Wound Care Flow Sheet noting that the wound had considerable depth and some tunneling but otherwise failed to record any wound dimensions. *Id*. at ¶ 26. RN Rotheram also cleaned the wound and changed the dressing. *Id*. The same day, at 11:58 pm, Dr. William Cattell entered a medical note for a visit he had with Plaintiff on October 22 in which he ordered

3

that Plaintiff had to follow up with the Wound Clinic, as recommended by Lancaster General Hospital. *Id*. at ¶ 27. The medical note came more than two days after the evaluation. *Id*.

**Day Five.** On October 25, 2021, Plaintiff again received care from the prison medical staff. RN Rotheram cleaned Plaintiff's wound, provided new dressing, and completed a Wound Care Flow Sheet that reported no signs of infection and did not record any wound measurements. *Id*. at ¶ 29. Nurse Susan Taylor also submitted a medical note. *Id*. at ¶ 28. The parties dispute whether that note erroneously stated that Plaintiff was in a restraint chair. *Id*.

**Day Six.** On October 26, 2021, the prison medical staff finally reached out the Wound Clinic to discuss Plaintiff's follow up care but a visit was not scheduled because the Wound Clinic did not want to see Plaintiff unless his wound was open and draining. *Id*. at ¶ 32; ECF No. 40 at ¶ 32. There is no evidence that Plaintiff received any wound care that day. ECF No. 37 at ¶ 31.

**Day Seven.** On October 27, 2021, medical care for Plaintiff's wound resumed. Licensed Practical Nurse (LPN) Ashleigh Tan-Pham completed a Wound Care Flow Sheet for Plaintiff, noting that the wound had considerable depth, that it was cleaned, that the dressing was changed, but otherwise failing to include any measurements. *Id*. at ¶ 37. Physician Assistant (PA) Jessica Lord ordered certain prescriptions for Plaintiff and Nurse Katherine Smith educated him on the procedures for requesting a sick call. *Id*. at ¶¶ 38-39.

That same day, prison officials at Lancaster County Prison received communications expressing concerns about Plaintiff's health. Detective Sergeant Preston Gentzler of East Lampeter Township Police emailed Charles Stevens, an investigator at the Lancaster County Prison, advising that he had interviewed Plaintiff's fiancée Tayisha Blaylock the previous day and was passing along concerns from Blaylock regarding Plaintiff not receiving appropriate medical care. *Id*. at ¶ 33. Stevens forwarded the email to prison officials and medical staff, including Deputy Warden Joseph Schiffer and Warden Cheryl Steberger, and stated that he was receiving a report from an

4

outside detective and that if Plaintiff was indeed not receiving proper care, the facility could face legal liability. *Id*. at ¶ 34. Deputy Warden Schiffer responded to the email later that day explaining that he addressed the concerns with the prison medical staff. *Id*. at ¶ 35.

**Day Eight.** On October 28, 2021, Plaintiff continued to receive treatment for his wound at the prison. LPN Smith filled out a Wound Care Flow Sheet that did not document any measurements of Plaintiff's wound but noted that the wound was cleaned and covered with new dressing. *Id*. at ¶ 41. PA Lord saw him that day as well and wrote in her medical note that Plaintiff refused to show her his wound. *Id*. at ¶ 42. Plaintiff, however, denies that he refused PA Lord's care. *See* ECF No. 38-1 at 10.

Communications between officials about Plaintiff's medical condition also continued on the eighth day. Lieutenant Jamal Leath sent an email to prison officials, including the Warden, advising that County dispatch called the office and reported that Blaylock called 911 to report that Plaintiff needed to go to the hospital and did not know whether to send an ambulance to the prison. ECF No. 37 at ¶ 43. Lieutenant Leath responded that prison medical staff were attending to Plaintiff and he informed dispatch that an ambulance did not need to be sent. *Id*.

**Day Nine.** On the penultimate day of Plaintiff's incarceration, Plaintiff's mother Jane Poole joined Blaylock's efforts to raise concerns about the adequacy of Plaintiff's care. Deputy Warden Schiffer sent an email in a previous thread reporting that Poole thought that Plaintiff was not being properly treated and could die. *Id*. at ¶ 46. Deputy Warden Schiffer assured Poole that Plaintiff was being taken care of by the prison medical staff. *Id*.

Consistent with Deputy Warden Schiffer's assurances, Plaintiff received care that day. RN Jessa Brooks completed a Wound Care Flow Sheet stating that the wound smelled foul and appeared to be moist with a yellow-green slough inside of it. *Id*. at ¶ 48. The wound was cleaned a re-dressed. *Id*. However, the Wound Care Flow Sheet again failed to note any measurements of

5

the wound. *Id*. at ¶ 49. RN Rotheram called NP Hehnly and told her that Plaintiff's wound was showing signs of infection, which prompted NP Hehnly to order antibiotics for Plaintiff. *Id*. at ¶ 50.

**Day Ten.** On October 30, 2021, the last day of Plaintiff's incarceration, PA Toby Catone saw him. PA Catone noted that Plaintiff's family had contacted the prison with concerns about his condition and had even reached out to 911. *Id*. at ¶ 53. When Nurse Taylor removed his undergarments, according to PA Catone, the wound had some pus-like material, black discoloration, and several inches of tunneling. *Id*. Because of these serious signs of infection, PA Catone ordered that Plaintiff be sent to the hospital. *Id*. About twenty minutes later, Plaintiff left Lancaster County Prison in an ambulance. *Id*. at ¶ 55.

    **b. Plaintiff Sues the Warden and Prison Medical Staff, Survives a Motion for Partial Judgment on the Pleadings, and Now Faces Two Motions for Summary Judgment.**

Exactly two years after his first day of incarceration, Plaintiff sued Lancaster County, Warden Steberger, and the prison medical staff, including Dr. Cattell, Nurse Alasar, Nurse Taylor, PA Lord, and NP Hehnly. *See generally* ECF No. 1. Plaintiff claimed that the Warden and the prison medical staff violated his constitutional rights by failing to provide him with adequate medical care. He asserted that PrimeCare—the prison medical staff's employer—also violated his constitutional rights by failing to provide the prison with the equipment necessary to provide proper medical care for imprisoned people who need specialized wound care. Beyond the constitutional claims, Plaintiff brought a medical negligence claim against the prison medical staff.

The County and the Warden moved for partial judgment on the pleadings to dismiss the constitutional claims against them on June 27, 2024. *See generally* ECF No. 22. The Court granted the motion as to the County because Plaintiff withdrew the claim against it when he amended his complaint. *See* ECF No. 26 at 1 n.1. But the Court rejected the motion as to the Warden because

Plaintiff sufficiently pleaded an Eighth Amendment claim by alleging that the Warden had actual knowledge that the prison medical staff were not properly treating him. *See id.*

Now, the remaining Defendants—the Warden and the prison medical staff—have filed motions for summary judgment to dismiss all but Plaintiff's medical negligence claim. The Warden says that she is entitled to summary judgment because she reasonably believed that Plaintiff was in the capable hands of medical professionals at the prison, which shields her from liability. *See* ECF No. 31 at 6. The prison medical staff argue that Plaintiff's constitutional claims cannot survive summary judgment because Plaintiff has not shown that their conduct rises to deliberate indifference. *See* ECF No. 34 at 12.

## III. LEGAL STANDARD

Summary judgment is appropriate when the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 954 F.3d 615, 618 (3d Cir. 2020). A fact is material if "it might affect the outcome of the suit under governing law." *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The party moving for summary judgment must "identify[ ] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In response, the nonmoving party must then "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient; there must be evidence on which the jury could

reasonably find for the [nonmovant]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252).

In applying this standard, the court must "construe the evidence in the light most favorable to the non-moving party." *Anderson*, 477 U.S. at 255. At the summary judgment stage, the court's role is not to weigh the evidence and determine the ultimate truth of the allegations. *Baloga v. Pittston Area Sch. Dist.*, 927 F.3d 742, 752 (3d Cir. 2019); *see also InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 160 (3d Cir. 2003) ("When analyzing the evidence under this summary judgment standard, a court is not to weigh the evidence or make credibility determinations; these tasks are left for the fact-finder." (internal quotation marks omitted)). Instead, the court's task is to determine whether there remains a genuine issue of fact for trial. *Id.*

## IV.     DISCUSSION

### a. Only One of Plaintiff's Eighth Amendment Medical Claims Survives.

Plaintiff argues that the Warden and prison medical staff violated his constitutional rights by failing to provide him with proper medical care for his pressure wound. The Eighth Amendment, through its ban on cruel and unusual punishment, prohibits prison officials from acting in deliberate indifference to the serious medical needs of incarcerated people. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prove an Eighth Amendment deliberate indifference claim under Section 1983, "a plaintiff must make (1) a subjective showing that 'the defendants were deliberately indifferent to his or her medical needs' and (2) an objective showing that 'those needs were serious.'" *Washington v. Gilmore*, 2025 WL 303063, at *1 (3d Cir. Jan. 27, 2025) (quoting *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017)) (citation omitted).

The parties do not disagree about whether Plaintiff has serious medical needs. *See generally* ECF No. 31. So Plaintiff satisfies the second prong of his Eighth Amendment claim. This case therefore turns on the first prong—whether the Warden and prison medical staff were

8

deliberately indifferent in treating Plaintiff's wound. The Court finds that Plaintiff has offered enough evidence from which a reasonable jury *could* return a finding of deliberate indifference against only one of the medical providers—Nurse Alasar. Because the deliberate indifference analysis is "slightly different" between non-medical prison officials and medical staff, the Court addresses them separately, beginning with the Warden. *Koukos v. Chester Cnty.*, 2017 WL 511634, at *5 (E.D. Pa. Feb. 7, 2017).

### i. Plaintiff Cannot Show that the Warden Acted With Deliberate Indifference.

In determining whether non-medical prison officials were deliberately indifferent to an imprisoned person's serious medical needs, such officials have a powerful shield—reliance on their medical staff. In *Spruill v. Gillis*, 372 F.3d 218 (3d Cir. 2004), the Third Circuit held that when an imprisoned person is under the care of medical experts, "a non-medical prison official will generally be justified in believing that the prisoner is in capable hands." *Martinez-Perez v. Clark*, 2024 WL 4589228, at *2 (3d Cir. Oct. 28, 2024) (quoting *id*. at 236) (citation omitted). The reason for this is that allowing a non-medical prison official to be "liable in a case where a prisoner was under a physician's care would strain [the prison's] division of labor." *Spruill*, 372 F.3d at 236. Thus, "absent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with the Eighth Amendment scienter requirement of deliberate indifference." *Id*.

Here, the parties dispute whether *Spruill* protects the Warden or actually establishes her knowledge of Plaintiff's alleged mistreatment. The Warden says that *Spruill* shields her because she had a reasonable belief that all imprisoned people at Lancaster County Prison were provided treatment by medical experts from PrimeCare that conformed to or exceeded the applicable standard of care. ECF No. 31 at 6. Plaintiff attempts to turn *Spruill* in his favor by claiming that the Warden was on notice that medical staff were mistreating him since she received emails

9

revealing that there were complaints about the adequacy of Plaintiff's treatment. *See* ECF No. 37 at 6-8.

The Court agrees with the Warden. Although the emails did notify the Warden about the concerns with the treatment Plaintiff was receiving, they also show that prison medical staff were addressing those issues. For example, on October 27, 2021, Deputy Warden Shiffer copied the Warden on an email stating that Blaylock did not think Plaintiff was "getting the proper care." *See* ECF No. 37-4 at 23. In that same email, Deputy Warden Shiffer reported that he relayed Blaylock's message to the medical staff, who confirmed that Plaintiff was being given medicine and would receive additional follow up care. *See id*. at 23-24. The Warden cannot be held liable for relying on the assurances of her medical staff that Plaintiff was receiving prompt and adequate medical attention. *See Pearson*, 850 F.3d at 543 ("[N]o reasonable jury could conclude that [the prison official] was deliberately indifferent for failing to second-guess the medical staff's appraisal of the situation."). And Plaintiff has not provided any proof suggesting that the Warden "should have doubted these [providers'] conclusions." *Chruby v. Bearjar*, 2025 WL 325751, at *4 (3d Cir. Jan. 29, 2025). So the Warden is entitled to summary judgment.

### ii. Plaintiff Has Only Offered Sufficient Evidence to Show that One Medical Provider—Nurse Klaudia Alasar—Acted With Deliberate Indifference.

In the context of prison medical staff, "[i]t is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute deliberate indifference." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999) (internal quotation marks omitted); *see also Durmer v. O'Carroll*, 991 F.2d 64, 67 (3d Cir. 1993) ("[T]he law is clear that simple medical malpractice is insufficient to present a constitutional violation."). Instead, "deliberate indifference requires obduracy and wantonness . . . which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk." *Koukos*, 2017 WL 511634, at *4 (internal quotation marks and citation omitted). The Third Circuit has "found deliberate

indifference in a variety of contexts including where (1) prison authorities deny reasonable requests for medical treatment, (2) knowledge of the need for medical care is accompanied by the intentional refusal to provide it, (3) necessary medical treatment is delayed for non-medical reasons, and (4) prison authorities prevent an inmate from receiving recommended treatment for serious medical needs." *Pearson*, 850 F.3d at 538.

With respect to deliberate indifference, courts have "recognized that there is a critical distinction between cases where the complaint alleges a complete denial [or delay] of medical care and those alleging inadequate medical treatment." *McGinnis v. Hammer*, 751 F. App'x 287, 290 (3d Cir. 2018) (internal quotation marks and citations omitted). In cases where a plaintiff challenges the adequacy of the medical care provided, "mere disagreement as to the proper medical treatment does not support a claim of an Eighth Amendment violation." *Conte v. Goodwin*, 2024 WL 3983086, at *7 (D.N.J. Aug. 29, 2024) (citation omitted). Rather, when medical care is provided, courts "presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." *Pearson*, 850 F.3d at 535.

On the other hand, "a delay or denial of medical treatment claim must be approached differently than an adequacy of care claim, and there is no presumption that the defendant acted properly." *Conte*, 2024 WL 3983086, at *7 (internal quotations marks and citation omitted). In such cases, a plaintiff needs to prove that "the defendant delayed or denied treatment with deliberate indifference." *McGinnis*, 751 F. App'x at 291 (citation omitted).

Beyond his Eighth Amendment medical claim against the Warden, Plaintiff also alleges that individual members of the prison medical staff were deliberately indifferent in treating his wound. Specifically, he asserts claims of both delay of medical treatment and inadequate medical care. Only the adequacy of care claim against Nurse Alasar survives summary judgment.

11

### 1. In the Delay of Care Context, Plaintiff Cannot Show that Dr. William Cattell, NP Lori Hehnly, or PA Jessica Lord Acted With Deliberate Indifference.

Plaintiff brings a delay of medical care claim against Dr. Cattell, NP Hehnly, and PA Lord. He argues that Dr. Cattell agreed that Plaintiff had to follow up with the Wound Clinic but did not enter an order requiring this appointment until over two days later on October 24, 2021. ECF No. 38 at 7-8. He claims that NP Hehnly failed to ensure that he was timely referred and attended to by the Wound Clinic.[1] *Id*. at 9. And he alleges that PA Lord did not follow up with him to determine if he still needed to be seen by the Wound Clinic.[2] *Id*.

No reasonable jury could find that any of the medical provider were deliberately indifferent in delaying treatment. The record confirms that Dr. Cattell did not place the order to consult the Wound Clinic until October 24, 2021, and that the medical providers did not speak with the Wound Clinic until October 26, 2021. *See* ECF 37 at Appx. 72; ECF No. 40 at ¶ 32. It is not enough, however, that there was a delay in ordering the consultation and contacting the Wound Clinic. To establish deliberate indifference here, Plaintiff must show that the delay "was motivated by non-medical factors." *Pearson*, 850 F.3d at 537. He fails to do so. The fact that there is no "identifiable medical reason explaining a treatment delay does not necessarily mean that the delay was motivated by a non-medical reason." *Miller v. Steele-Smith*, 713 F. App'x 74, 80 (3d Cir. 2017) (citation omitted). And nothing in the record supports a "finding than any delay attributable to [Dr.

---

[1] Regarding Plaintiff's claim that NP Hehnly did not ensure that he received follow up care with the Wound Clinic, the Court finds that there is a lack of evidence verifying this assertion. *See* ECF No. 39 at ¶ 28; *see also* ECF No. 32 at Appx. 82. This alone dooms Plaintiff's claim as he bears the burden to "come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotation marks and citation omitted). However, the Court accepts the claim as true here because it still fails on the merits.
[2] The Court also finds that Plaintiff's assertion that PA Lord was required to follow up with him to determine if he needed to consult with the Wound Clinic lacks support. *See* ECF No. 39 at ¶ 28; *see also* ECF No. 32 at Appx. 77. As mentioned above, this alone is enough for PA Lord to prevail on this issue. *See Santini* 795 F.3d at 416. But the Court will accept the assertion as true since it also fails on the merits.

Cattell, NP Hehnly, or PA Lord] was motivated by non-medical factors, such as a desire to punish [Plaintiff], to lessen [their] own workload, or to save [the prison] money." *Id.* (citing *Durmer*, 991 F.2d at 68-69). So, at most, the delay was negligent, which does not give rise to a constitutional violation. *Rouse*, 182 F.3d at 197 ("It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.'"). Therefore, Dr. Cattell, NP Hehnly, and PA Lord are entitled to summary judgment on this issue.

### 2. In the Adequacy of Care Context, Plaintiff Has Only Offered Sufficient Evidence to Show that Nurse Klaudia Alasar Acted With Deliberate Indifference.

Plaintiff asserts an inadequate medical care claim against Nurse Alasar, Nurse Taylor, and PA Lord. He acknowledges that he received medical care from these providers. But the care, he says, was inadequate. *See* ECF No. 38 at 8-10.

In cases "[w]here a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Ascenzi v. Diaz*, 247 F. App'x 390, 391 (3d Cir. 2007) (quoting *United States ex rel. Walker v. Fayette County*, 599 F.2d 573, 575 n.2 (3d Cir.1979)). So, as discussed earlier, "when medical care is provided, [federal courts] presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care." *Pearson*, 850 F.3d at 535 (citing *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990)).

However, "the mere receipt of inadequate medical care does not itself amount to deliberate indifference—the defendant must also act with the requisite state of mind when providing that inadequate care." *Id*. This means that "there are two very distinct subcomponents to the deliberate indifference prong of an adequacy of care claim. The first is the adequacy of the medical care—

13

an objective inquiry where expert testimony could be helpful to the jury. The second is the defendant's state of mind—a subjective inquiry that can be proven circumstantially without expert testimony." *Evans v. Columbia Cnty.*, 711 F. Supp. 3d 256, 277-78 (M.D. Pa. 2024) (quoting *id*. at 536).

Beginning with the objective inquiry, a reasonable jury could find that the medical treatment provided by Nurse Alasar, Nurse Taylor, and PA Lord was inadequate. The objective subcomponent of the deliberate indifference prong of an Eighth Amendment claim can be satisfied by "medical expert testimony" that a medical provider "breached a professional standard of care." *Pearson*, 850 F.3d at 536; *see also Porter v. Pennsylvania Dep't of Corr.*, 974 F.3d 431, 443 n.6 (3d Cir. 2020). Plaintiff has presented such evidence. He first claims that Nurse Alasar, Nurse Taylor, and PA Lord failed to fully and accurately complete certain medical documentation. Specifically, he says that Nurse Alasar did not completely record the characteristics, including the measurements, of his wound in a Wound Care Flow Sheet. ECF No. 38 at ¶ 23. He contends that Nurse Taylor erroneously reported in a medical note that Plaintiff was in a "restraint chair."[3] *Id*. at ¶ 28. And he asserts that PA Lord falsely stated in a medical note that Plaintiff was "ambulating with brisk and balanced gait." *Id*. at ¶ 42. He then points to a report from medical expert Dr. Herman explaining that these shortcomings fall "well below the standard of care" and led to his medical injuries:

> The documentation regarding wound care showed there [sic] the care provided fell well below the standard of care. . . . No measurements of the wounds were ever given after the initial intake. . . . The Wound Care Flow sheets prepared on October 22, 24, 25, 27[,] 28[,] and 29 are without necessary information and the majority of the fields left blank.
> These items show a significant lack in attention to detail and call into question [the] competency in general of the providers who authored them. This falls below the

---

[3] To the extent that Nurse Taylor argues that she did not document any false information, the Court finds that this a "genuine" factual dispute that cannot be settled at this stage. *Cephalon, Inc.*, 954 F.3d at 618; *see also* ECF No. 38 at ¶ 28.

> expected standard of care for ability to assess, document and communication of medical findings and medical decision making, crucial elements of standard of health care.
>
> Care by the medical team at the Lancaster County Prison in this case falls below the expected standard of care . . . . These breaches have led to significant negative medical outcomes and preventable medical injuries suffered by the plaintiff.

*See* ECF No. 38 at Appx. at 301-02, 304. Plaintiff's allegations coupled with the expert report are sufficient to allow a trier of fact to find that the three providers deviated from the standard of care. *See Pearson*, 850 F.3d at 536.

There is a wrinkle here—the prison medical providers' own medical expert testimony. The medical professionals have submitted two expert reports from Dr. Joshua and Dr. Lautenbach confirming that their treatment of Plaintiff met the professional standard of care. *See generally* ECF No. 32 at Appx. 179-201. If this testimony were not rebutted by Plaintiff's own expert report, the claims against the medical professionals would likely fail. *See Averill v. Jones*, 2022 WL 605815, at *6 (D. Del. Jan. 19, 2022) (holding that medical defendants were entitled to summary judgment on plaintiff's inadequate medical care claim because defendants submitted an unrebutted expert report confirming that their treatment met the professional standard of care). But that is not the case here. Plaintiff has provided his own medical expert testimony claiming that the standard of care was not satisfied. This creates a "genuine issue for trial" as to whether Nurse Alasar, Nurse Taylor, and PA Lord violated the standard of care and thus provided inadequate medical care. *Celotex*, 477 U.S. at 324; *see also Evans*, 711 F. Supp. 3d at 277.

Turning to the subjective inquiry, Plaintiff only offers enough evidence from which a reasonable jury could find that Nurse Alasar acted with the requisite state of mind when providing inadequate medical care. Deliberate indifference "requires both that an individual be aware of facts from which the inference could be drawn of a substantial risk [of serious harm] and that the individual actually draws that inference." *Thomas v. City of Harrisburg*, 88 F.4th 275, 281 (3d Cir.

15

2023) (quoting *Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 582 (3d Cir. 2003)). The record shows that Nurse Alasar knew that nurses providing wound care at Lancaster County Prison were required by policy to document the size of the wound.

> Q. Would it be protocol to document the size of the wound every time that wound care is provided for a pressure wound?
> A. I think so.
> Q. Would that be the standard that you would be expected to follow at the Lancaster County jail?
> A. I believe so.

*See* ECF No. 38 at Appx. 179-80, 197, 212-13, 242-43. And Nurse Alasar acknowledged that this policy existed to help providers in determining whether wounds were "getting better or worse."

> Q. Why would it be necessary, if you are the first caregiver at the prison, to provide wound care to an inmate, why would it be important to document the measurements of the wound?
> A. So we know if the wound is getting better or worse, and to let the provider know what we have.

*See id*. at Appx. 179. Despite having this knowledge, there is evidence showing that Nurse Alasar failed to fully record the measurements of Plaintiff's wounds. *See* ECF No. 38 at ¶ 23. Based on her understanding of the policy and its purpose, a reasonable jury could conclude that Nurse Alasar understood that her failure to properly document the measurements of Plaintiff's wound posed a substantial risk of serious harm by preventing providers who treated him later from fully appreciating the wound's worsening condition and taking proper steps to prevent infection. Thus, the Eighth Amendment medical claim against Nurse Alasar survives summary judgment.

The record, however, lacks sufficient evidence to support a finding that the remaining providers—Nurse Taylor and PA Lord—acted with deliberate indifference. Plaintiff says that Nurse Taylor and PA Lord filled out false information about his condition in their medical notes. ECF No. 38 at ¶¶ 28, 42. Even if the notes were actually "incorrect," this does not prove that either of the providers were "deliberately indifferent to [Plaintiff's] medical needs." *Nixon v. United*

*States*, 2025 WL 1019073, at *4 (M.D. Pa. Apr. 4, 2025). Plaintiff must still put forth evidence that the providers knew that their incorrect notes posed a serious risk of harm to him. Unlike in Nurse Alasar's case, Plaintiff does not point to any proof showing that Nurse Taylor and PA Lord had this knowledge. And nothing in the record supports that assertion either. Thus, his claim that the providers recorded "incorrect" information is "indicative of nothing more than negligence on the part of the medical providers." *Woolford v. McDonald*, 61 F. Supp. 3d 454, 460 (D. Del. 2014). Because medical negligence "do[es] not constitute deliberate indifference," Plaintiff's claims against Nurse Taylor and PA Lord fall at summary judgment. *Rouse*, 182 F.3d at 197 (internal quotation marks omitted).

### b. Plaintiff's *Monell* Claim Fails.

Plaintiff's last constitutional claim is that PrimeCare violated his constitutional rights by failing to provide the prison with the equipment necessary to provide adequate medical care for imprisoned people who need specialized wound care. Although the claim against one of the medical professionals survives summary judgment, PrimeCare is not vicariously liable for the conduct of its employee. *See Carroll v. Lancaster Cnty.*, 301 F. Supp. 3d 486, 504 (E.D. Pa. 2018). Instead, to prove this *Monell* claim, Plaintiff "must show both that his rights were violated and that [PrimeCare] is responsible for that violation." *Hightower v. City of Philadelphia*, 130 F.4th 352, 355 (3d Cir. 2025). This requires a showing that PrimeCare was the "moving force" behind the violation of Plaintiff's constitutional rights. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). Plaintiff can do this by establishing either that PrimeCare "(1) had an unconstitutional policy or custom or (2) was deliberately indifferent to inmates' rights." *Hightower*, 130 F.4th at 356.

*Monell* claims usually proceed in one of two ways. First, a plaintiff may allege that an "unconstitutional policy" or "custom" led to his injuries. *Est. of Roman v. City of Newark*, 914

17

F.3d 789, 798 (3d Cir. 2019). Under this path, a plaintiff may also assert that a "lack of policy" led to his constitutional rights being violated. *Caiby v. Haidle*, 2022 WL 2987908, at *10 (M.D. Pa. July 27, 2022); *see also Natale*, 318 F.3d at 585. Second, a plaintiff may argue that his injuries were "caused by a failure or inadequacy by the municipality that 'reflects a deliberate or conscious choice.'"[4] *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (quoting *Brown v. Muhlenberg Township*, 269 F.3d 205, 215 (3d Cir. 2001)).

Summary judgment in PrimeCare's favor is appropriate. Plaintiff says that PrimeCare failed to establish a policy that provided its medical staff with equipment to properly treat imprisoned people who have pressure wounds. ECF No. 38 at 10-11. Of course, "the lack of an affirmative policy regarding how to address the serious medical needs of [an incarcerated person] can give rise to *Monell* liability." *McPherson v. Cnty. of Dauphin*, 2020 WL 1558206, at *5 (M.D. Pa. Mar. 24, 2020). But, while Plaintiff "may disagree" with the treatment provided by PrimeCare, he has not shown that PrimeCare failed to establish a policy for providing wound care. *Coyle v. Montgomery Cnty., Pennsylvania*, 2023 WL 2576843, at *17 (E.D. Pa. Mar. 20, 2023). In fact, the opposite is true—Plaintiff concedes that he received care for his serious medical needs, including routine wound care, evaluations, diagnostic testing, and medications. *See* ECF No. 34 at 16. Further, Plaintiff has not argued that there was a "lack of training or supervision" within PrimeCare. *Noble v. City of Camden*, 112 F. Supp. 3d 208, 224-25 (D.N.J. 2015). So his *Monell* claim fails at this stage.

  c. **Plaintiff's Punitive Damages Claim Survives.**

Finally, Plaintiff's claim for punitive damages moves past summary judgment. Punitive damages are permitted in Section 1983 cases. *See Smith v. Wade*, 461 U.S. 30, 56 (1983) (holding

---

[4] "We consider allegations of failure to train, supervise, and discipline together because they fall under the same species of municipal liability." *Estate of Roman v. City of Newark*, 914 F.3d 789, 799 n.7 (3d Cir. 2019).

that "a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others."). According to the prison medical staff, Plaintiff's punitive damages claim should be dismissed because they provided Plaintiff with reasonable medical care. ECF No. 34 at 19. However, "an inquiry into the availability of punitive damages and the intent behind a defendant's conduct is inherently fact-specific." *Judge v. Shikellamy Sch. Dist.*, 135 F. Supp. 3d 284, 300 (M.D. Pa. 2015), *aff'd*, 905 F.3d 122 (3d Cir. 2018). Thus, based on the record before us, the Court declines to decide this issue now and the claim for punitive damages survives.

V.   **CONCLUSION**

"Deliberate indifference entails something more than negligence." *Farmer v. Brennan*, 511 U.S. 825, 826 (1994). In this case, Plaintiff has offered enough evidence from which a reasonable jury could find that Nurse Alasar's failure to fully document the size of Plaintiff's wound rose to deliberate indifference. But the rest of his constitutional claims show negligence at best. So, the only Eighth Amendment claim that survives summary judgment is the one against Nurse Alasar. An appropriate order follows.

BY THE COURT:

*/s/ John M. Gallagher*
JOHN M. GALLAGHER
United States District Court Judge